**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISETTE L. LEE,** | : | |
| **Petitioner,** | : | **Civil Action 2:12-cv-327** |
| | | **Criminal Action 2:10-cr-160(1)** |
| **v.** | : | |
| | | **Judge Algenon L. Marbley** |
| **UNITED STATES OF AMERICA,** | : | |
| | | **Magistrate Judge Elizabeth P. Deavers** |
| **Respondent.** | : | |

## ORDER AND REPORT AND RECOMMENDATION

This matter is before the Court for consideration of Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. In her Motion, Petitioner raises seven claims of ineffective assistance of counsel related to her counsel's actions during her prosecution, conviction and sentence. Also before the Court is Respondent's Return of Writ, as well as Petitioner's Traverse. (ECF Nos. 222 and 256.) Additionally before the Court for consideration are Petitioner's First and Second Amendments to her Motion. (ECF Nos. 247 and 246.) Finally, also before the Court is Petitioner's Motion to Transfer to Presiding Judge and Respondent's Opposition thereto. (ECF Nos. 261 and 262.) For the reasons that follow, Petitioner's Motion to Transfer to Presiding Judge is **DENIED AS MOOT**. (ECF No. 261.) It is **RECOMMENDED** that Petitioner's first, second, and fourth through sixth claims of relief be **DENIED**. (ECF No. 222.) It is further **RECOMMENDED** that Petitioner's third claim of relief as it relates to her counsel's failure to seek suppression of her pre-arrest statements be **DENIED**. With respect to the remaining portion of Petitioner's third claim of relief, pursuant to Rule 7 of the Rules Governing Section 2255

Cases,[1] the parties are **DIRECTED** to expand the record on the narrow issues of (1) whether her attorneys at the time withdrew their motion to suppress pursuant to a calculated strategy; and (2) whether Petitioner's motion to suppress the evidence seized from the traffic stop was meritorious. Specifically, the parties are **DIRECTED** to submit affidavits from those individuals having personal knowledge of these issues. The affidavits must be properly authenticated. It is further **RECOMMENDED** that Petitioner's seventh claim of relief as it relates to her counsel's failure to consult about appealing the denial of her discovery motion be **DENIED**. With respect to the remaining portion of Petitioner's seventh claim of relief, the parties are **DIRECTED** to expand the record on the narrow issues of (1) whether non-frivolous grounds existed for an appeal of her sentence; (2) whether Petitioner expressed an interest in appealing; and (3) whether a reasonable probability exists that Petitioner would have appealed her sentence had counsel consulted with her. Again, the parties are **DIRECTED** to submit properly-authenticated affidavits from those individuals having personal knowledge of these issues.

---

[1]Rule 7 of the Rules Governing Section 2255 Cases provides in pertinent part as follows:

(a)     If the Motion is not dismissed, the judge may direct the partes to expand the record by submitting additional materials relating to the motion. The Judge may require that these materials be authenticated.

(b)     The materials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits also may be submitted and considered as part of the record.

(c)     The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.

Rule 7 of the Rules Governing Section 2255 Cases.

The Court imposes the following briefing schedule with respect to the requirement that the parties submit supplemental briefing: the parties are **DIRECTED** to expand the record by providing the materials as set forth herein **WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER**. The parties are further **DIRECTED** to admit or deny the correctness of the opposing party's materials **WITHIN FORTY-FIVE (45) DAYS OF THE DATE OF THIS ORDER**.

## I.

On February 4, 2011, Petitioner, pursuant to the terms of a negotiated plea agreement, pled guilty to conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana. (Plea Tr. 4, ECF No. 132.) Pursuant to her guilty plea, on June 10, 2011, the Court sentenced Petitioner to seventy-two (72) months of incarceration and five (5) years of supervised release. (Sent. Tr. 38, ECF No. 181.) Petitioner did not file a direct appeal. On April 13, 2012, Petitioner filed the instant Motion to Vacate, Set Aside, or Correct Sentence, in which she alleges that she was denied effective assistance of counsel.

During the hearing at which the Court accepted Petitioner's plea of guilty in her underlying criminal case, Petitioner admitted to the facts that form the basis of her guilty plea and conviction.[2] According to her admissions, between approximately November 2009 and June 2010 Petitioner knowingly participated in a large-scale conspiracy to transport and distribute marijuana from California to Ohio. (Plea Tr. 15, 17, ECF No. 132.)[3] Petitioner and her co-conspirators were

---

[2] As discussed in detail *infra*, Petitioner now advances a version of events that differs substantially from that to which she admitted during the plea proceedings. For ease of reference and context, at this juncture the Undersigned refers to the facts before the Court at the time it accepted Petitioner's plea.

[3] During the hearing, Drug Enforcement Agency ("DEA") Agent Matthew Heufelder offered the following statement of facts, to which Petitioner admitted:

responsible for hauling approximately fourteen (14) separate shipments to Ohio, with each

shipment consisting of roughly five hundred (500) pounds of marijuana.  Federal agents estimated

For a period of time between approximately November 2009 and June 2010, Lisette Lee was knowingly a participant in a large-scale marijuana distribution organization in the Southern District of Ohio and elsewhere.  This group was responsible for the transport and distribution of approximately 14 separate shipments during this time period, with each shipment consisting of approximately 500 pounds of marijuana.  It is conservatively estimated that this organization distributed 700 pounds of marijuana and realized a net profit of over $3 million during the time of this conspiracy.

Lee was identified as a member of this group for the entire time period of the conspiracy. Lee was the primary courier and face of a group of four or five individuals that transported these 500-plus pounds of marijuana shipments from Los Angeles to the Southern District of Ohio for distribution.  Lee traveled with three to four other couriers on each occasion.  Lee participated in all facets of the transportation of the marijuana loads from Los Angeles, California, to Ohio, as well as the transport of drug proceeds back to Los Angeles.  This also included on several occasions storing the entire 500-plus pound marijuana shipment at her Los Angeles, California residence for one or two days prior to traveling to Ohio.

On approximately 14 occasions between November 2009 and June 2010, Lee's participation in each trip included the following: Lee was provided money by David Garrett, approximately $60,000 per trip, to pay for a round trip, chartered private jet from Lost Angeles, Van Nuys airport, to several cities in Ohio.  The destination of the majority of these flights was Columbus.  Lee participated in organizing the logistics of each trip, the lease of the charter aircraft, and the payment of the other couriers at the conclusion of each trip.

Lee sometimes accompanied other codefendants as they regularly made wire transfers in amounts ranging between 40 to $50,000 to pay for the charter flight prior to each trip. These payments were made in cash.

Once in Columbus, Lee and other couriers distributed the marijuana to area customers, then collected and packaged the proceeds for the return flight to Los Angeles, California, on the charter plane.

Following her arrest in Columbus, Ohio, on June 14th, 2010, Lee directed codefendant Christopher Cash to remove, to move to another location, and/or dispose of items from her residence in Los Angeles.  These actions resulted in the execution of two search warrants in Los Angeles on June 23, 2010.

These events occurred in the Southern District of Ohio and elsewhere.

(Transcript of Plea Proceedings, 15:14-17:13, ECF No. 132.)

that the organization distributed 7,000 pounds of marijuana and realized a net profit of over $3 million. *Id.*

Petitioner admitted to being the primary courier and face of the conspiracy. *Id.* at 16, 17. For each of the fourteen trips, she admitted that her co-defendant, David Garret, provided her approximately $60,000 to arrange for a round-trip chartered jet to travel from Los Angeles, California to one of several cities in Ohio. Petitioner admitted that she participated in organizing the logistics of each trip, leasing the chartered aircraft, and paying couriers to accompany her on the trips. *Id.* Once Petitioner landed in Columbus, her co-conspirators distributed the marijuana to area customers. *Id.* at 17. Petitioner then transported the proceeds of the conspiracy back to California. Also in furtherance of the conspiracy, Petitioner admitted to storing loads of approximately five hundred (500) pounds of marijuana in her California residence for one or two days prior to transporting them to Ohio. *Id.* at 16, 17. She also admitted to recruiting her personal assistant and bodyguard to participate in the conspiracy with her. (PSI 5.) She later recruited a third individual to participate as well.

During a pre-sentence interview, Petitioner informed a Probation Officer that she is an heiress to the Samsung fortune and an aspiring model and actress. (PSI 8, 9.) She stated that she convinced herself that she had accepted an acting job when she agreed to become involved in the conspiracy. *Id.* at 13. Petitioner indicated that she felt she would not suffer the full consequences of trafficking marijuana because she was only the "face" of the organization. *Id.* at 13. She believed her co-defendant Garrett asked her to become involved because she looked glamorous and would not be suspected of transporting drugs. *Id.* at 4-5.

From her arrest through sentencing, Petitioner hired and fired three sets of lawyers to represent her at various stages of the criminal proceedings. In the instant § 2255 motion, which she files *pro se*, Petitioner claims that each of her lawyers provided ineffective assistance of counsel.

## II.

### A.     Standard for Claims of Ineffective Assistance of Counsel

Nearly forty years ago, the United States Supreme Court reiterated that the right to counsel guaranteed by the Sixth Amendment to the U.S. Constitution is the "right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a complaint of ineffective assistance of counsel, a defendant must meet the now-familiar two-prong *Strickland* test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. The Supreme Court emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Put plainly, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.*

Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 692. Rather, a defendant must demonstrate prejudice to prevail on a claim of ineffective assistance of counsel. *Id.* at 693. To do so, a defendant must establish that a reasonable probability exists that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because a defendant must satisfy both prongs of the *Strickland*

test to demonstrate ineffective assistance of counsel, should the court determine that she has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The two-prong *Strickland* test for ineffective assistance of counsel also applies to a defendant's challenge to plea-negotiations in a criminal prosecution. *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). When a defendant challenges her counsel's performance as it relates to plea proceedings, the "first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence" previously delineated by the Supreme Court. *Id.* "The second, or 'prejudice,' requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he [or she] would not have pleaded guilty and would have insisted on going to trial." *Id.* The Supreme Court further elaborated as follows:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Id.* at 59-60 (internal citation omitted); *see also Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006) (quoting *Hill* 474 U.S. at 59) (noting that to establish prejudice, a "defendant must show that 'but

for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial'"). Finally, "the assessment of prejudice must include a prediction of the likely outcome at trial." *Id.*

**B.      Standard for Pleadings Filed *Pro Se***

As Petitioner emphasizes repeatedly in her briefing, *pro se* pleadings are "to be liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Liberal construction extends to *pro se* filings in which the petitioner seeks post-conviction relief. *See Hudson v. Lafler*, 421 Fed. App'x 619, 626 (6th Cir. 2011) (quoting *Franklin v. Rose*, 765 F.2d 82, 84-85 (6th Cir. 1985) ("'[C]ourts should liberally construe a pro se habeas petition 'to encompass any allegation stating federal relief.'"). Nevertheless, "[w]hile *pro se* litigants are afforded significant leeway . . ., those who proceed without counsel must still comply with the procedural rules that govern civil cases." *Frame v. Superior Fireplace*, 74 Fed. App'x 601, 603 (6th Cir. 2003).

The Court notes that Petitioner's status as a *pro se* litigant is by her own design. Per her own description, Petitioner is well-educated, sophisticated, and has access to significant financial resources which would permit her to retain an attorney. Nevertheless, the Court affords her pleadings the requisite liberal construction the law compels.

**III.**

As a preliminary matter, Petitioner's Motion to Transfer to Presiding Judge is **DENIED AS MOOT**. (ECF No. 261.) Petitioner requests that this matter be transferred to the District Judge for disposition to avoid further delay. The Court finds Petitioner's Motion lacking in merit, and rendered moot by the instant Order and Report and Recommendation.

# IV.

A prisoner seeking relief under § 2255 "'must allege as a basis of relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact that was so fundamental as to render the entire proceeding invalid.'" *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (quoting *Mallet v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). Here, Petitioner contends in each of her seven claims of relief that she was denied effective assistance of counsel, which places her allegations in the first category of purported error of a constitutional dimension. To prevail, Petitioner must prove by a preponderance of the evidence that she was denied effective assistance of counsel. *Pough*, 442 F.3d at 964; *see also McQueen v. United States,* 58 Fed. App'x 73, 76 (6th Cir. 2003) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").[4]

"'In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'" *Howard v. United States*, 485 Fed. App'x 125, 128 (6th Cir. 2012) (quoting *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007)). A hearing is required unless the "'record conclusively shows that the petitioner is entitled to no relief.'" *Id.* (quoting *Valentine*, 488 F.3d at 333). In other words, a hearing is not required if "'the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statement of fact.'" *Brown v. United States*, 261 Fed. App'x 865, 869 (6th Cir. 2008) (quoting *Valentine*, 488 F.3d at 333).

---

[4]Petitioner's various briefs are inconsistent in terms of identification and numbering her claims for relief. As such, the order in which the Court presents her claims below does not correspond to the order in which she presents and numbers them in her briefs.

**A.      Counsel's Failure to Pursue Defense of Coercion and Duress**

Petitioner first contends that she was denied effective assistance of counsel because her attorneys refused to pursue a defense of coercion and duress.  Instead, her attorneys purportedly forced her to pursue a strategy that overstated her participation in the conspiracy.  In the following sections, the Court addresses the facts Petitioner alleges support a duress defense and her counsel's purported responses to them.

**1.      Facts Purportedly Supporting Duress Defense**

Petitioner avers that her co-defendant, David Garrett, and a man known to her as Marco threatened and coerced her into participating in the criminal conspiracy.  She contends that she met Garrett at a party in 2009.  (Lee Decl. at ¶ 2, ECF No. 222.)  Although she was engaged to be married to someone else at the time, Petitioner began a romantic relationship with Garrett.  *Id.* at ¶ 7.  Petitioner kept the affair hidden from her family members.  Nor did she tell Garrett that she was engaged.

According to Petitioner, Garrett made strange comments during the course of their relationship.  He purportedly ranted that he had witnessed drug dealers make poor business decisions, and boasted that "if he were in that business, he would run it professionally, like a corporation, which would be bigger than anything in the film 'Scarface.'" *Id.* at ¶ 3.  Garrett allegedly expressed immense interest in Petitioner's experience traveling by chartered jets.  *Id.*  at ¶ 6.  He purportedly wanted to know all about traveling by chartered jet, including the procedures used to engage the jets and how the arrangements were handled.  *Id.*

Petitioner avers that Garrett's behavior soon began to cause her concern.  She contends that she heard a rumor that Garrett sold cocaine.  *Id.* at ¶ 4.  She also learned that he kept firearms in his home.  *Id.* at ¶ 5.  Garrett allegedly bragged that he had physically assaulted people who "crossed

10

him" in the past. *Id.* Petitioner also learned that he was raised in an "economically depressed section of Los Angeles where [she] believed, based on discussions with Garrett as well as news reports . . .[,] that gun possession and violent encounters were commonplace." *Id.* These developments allegedly prompted Petitioner to distance herself from Garrett.

At that point, according to Petitioner, Garrett started to display threatening behavior. Garrett purportedly telephoned Petitioner and said he saw a photograph of her with another man on the Internet. *Id.* at ¶ 7. According to her declaration, Petitioner revealed to Garrett then that she was engaged to the man in the photo. Garrett became angry and demanded that she meet with him in person; Petitioner refused. Petitioner then describes encounters during which Garrett began to show up at restaurants and other places where Petitioner was dining with her fiancé or family members. *Id.* at ¶ 8-9. Petitioner contends that she noticed Garrett following her on one occasion. *Id.* at ¶ 9. Ultimately, Petitioner reluctantly agreed to meet Garrett in person at a public park.

According to Petitioner, Garrett was visibly angry when he pulled up in his vehicle for the in-person meeting. *Id.* at ¶ 9. She says he slammed the car door, shouted at her, and pounded on the hood of her car with his fists. *Id.* Petitioner avers that Garrett's behavior frightened her. He allegedly told her she would have to "make this right." *Id.* He purportedly demanded that she provide him access to a chartered jet. According to Petitioner, Garrett threatened to harm her or her loved ones if she did not comply with his demands. He purportedly stated that he could easily locate her fiancé and family members to cause them harm. He said if she made "a couple" of trips to Ohio to transport cash on a chartered jet, nobody would get hurt. *Id.* at ¶ 10. According to her declaration, Petitioner feared for her safety and the safety of her loved ones. *Id.* at ¶ 9. She also feared that if she refused to cooperate Garrett would disclose their affair to her family.

Petitioner arranged for the trips as Garrett instructed. She contends that Garrett instructed her regarding the day, time, and destination for each trip. *Id.* at ¶ 13. Her role, according to her declaration, was limited to paying for the jets in advance and showing up for the trips. She alleges that she was told to "[s]hut [her] mouth, and open [her] wallet." *Id.* at ¶ 13. Petitioner now denies that she ever knew the details of the operation. She states that she had no knowledge as to the identify of the couriers. She did not distribute any drugs. She did not request, expect, or receive payment for her participation, other than reimbursement for the costs she advanced. *Id.*

After arranging three trips, Petitioner contends that she sought to back-out of the criminal enterprise. *Id.* at ¶ 14. Garrett allegedly told her it would be dangerous for her to quit. He purportedly said he worked for a man named Marco, and that "these guys don't play." *Id.* at ¶ 15. He indicated that Marco was dangerous and capable of harming Petitioner and her family members. Garrett allegedly stated again that he could easily find her loved ones. Although Petitioner had never met Marco, she contends that she feared he or Garrett would harm her or her family if she quit the conspiracy. *Id.* at ¶ 16.

According to Petitioner, after she arranged several trips for Garrett, Marco called her on her personal cell phone and stated that Garrett no longer worked with him. *Id.* at ¶¶ 13, 17. Petitioner contends that Marco's call frightened her because she had never given him her phone number. She later met Marco in person, at which time he demanded that she participate in five additional trips to Ohio. *Id.* at ¶ 18. He purportedly telephoned her in the weeks that followed, warning that he had "eyes and ears everywhere." *Id.* Marco allegedly commented on the clothing Petitioner wore or the cars that she drove, which led Petitioner to believe he was having her followed. *Id.* at ¶ 19. Petitioner avers that from the time Marco first called her until the day of her arrest, she was in "constant" fear that Marco would harm her or her loved ones if she did not do as he said. *Id.*

Petitioner also feared that if she did not continue to engage in the activity, her family would learn that she had engaged in an affair with Garrett. Thus, according to Petitioner, she unwillingly continued to participate in the criminal activity. She contends that she participated in a total of eight or nine flights before her arrest.

### 2.     Counsel's Response to Petitioner's Claim of Duress

According to Petitioner, she told each of her six attorneys about Garrett's and Marco's threats. She contends that her lawyers refused to investigate the threats or disclose them to the prosecutor or the Court. Instead, Petitioner's counsel pursued a strategy which she contends overstated her involvement in the conspiracy, ultimately leading to a more severe sentence.

### a.     R. William Meeks and David H. Thomas

Petitioner met with her first set of attorneys, R. William Meeks and David H. Thomas, on June 16, 2010. (Lee 06/14/12 Decl. ¶ 9, ECF No. 247-2.) During the meeting, Petitioner purportedly told her attorneys how Garrett and Marco had threatened and coerced her to participate in the criminal activity. She revealed her brief affair with Garrett, and the strange and threatening behavior he displayed. She reiterated all of this information in a second meeting on June 22, 2010. *Id.* at ¶ 11. At this second meeting, Petitioner's godfather informed her counsel that she had been displaying signs similar to those a hostage might convey during the months of the conspiracy. *Id.*

Petitioner contends that Meeks and Thomas refused to advance the duress defense. Meeks purportedly told Petitioner her story "wouldn't fly." *Id.* at ¶ 11. He said it "wouldn't hold water," and she needed to follow his lead. *Id.* at ¶ 12. Meeks allegedly said he was experienced with drug cases, and he knew what strategies would work. *Id.* at ¶ 13. He purportedly devised the theory that Petitioner was an enormously privileged yet emotionally empty actress, who was just "acting out" a

13

pseudo role as the star in a drug movie.  *Id.*  Petitioner alleges that she and members of her family

told Meeks and Thomas that they felt uncomfortable misleading the prosecutor and the Court.

Meeks and Thomas purportedly responded that they knew what would work, and that Petitioner

must follow their lead or she could face twenty years in prison.

According to Petitioner, Meeks and Thomas continued with their defense strategy despite

her objection.  They arranged a proffer session and allegedly "aggressively bullied" her into

conforming her statements to their story.  They instructed her to agree to the contents of her co-

conspirators' statements, even though the statements portrayed her as being more heavily involved

than she really was.  *Id.* at ¶ 19.  According to Petitioner, any time she or members of her family

would hesitate to continue with what they perceived to be a misleading defense strategy, Meeks and

Thomas allegedly warned them that they were "playing with fire."  *Id.* at ¶ 16.  Meeks purportedly

said that the prosecutor already disliked Petitioner, and that he was "going to want to flex his

muscle on this case and show her who's boss."  *Id.* at ¶ 24.  Dissatisfied with her counsel's failure

to disclose the threats and coercion, Petitioner terminated Meeks and Thomas in September 2010.

### b.      James Owen and Todd Long

Petitioner next hired James Owen and Todd Long to represent her.  In an October 2010

meeting, she informed both Owen and Long of the threats and coercion that allegedly caused her to

participate in the criminal activity.  Both attorneys urged her to continue with the strategy Meeks

had developed.  Long purportedly said the threats and coercion were "not something we can readily

prove so it's best that we don't bring it to light." (Lee 06/14/12 Decl. Concerning Owen, ¶ 4, ECF

No. 247-2.)  According to Petitioner, Owen added to the theory that Petitioner was starving for her

father's attention and participated in the conspiracy to craft a new identity for herself.  (Am. Pet.

14

14, ECF No. 247.)  He told Petitioner the strategy would "solicit empathy from the Court, suggesting that the judge was a father and would understand neglected children."  *Id.*

Despite requests from Petitioner and members of her family, Owen and Long refused to disclose the threats and coercion.  In fact, Petitioner alleges that Owen took affirmative steps to conceal the truth from the prosecutor and the Court.  She contends Owen arranged a polygraph test to dispel the prosecutor's concern that Petitioner was romantically involved with Garrett. (Lee 06/14/12 Decl. Concerning Owen, ¶ 9, ECF No. 247-2.)  On the question of whether she had been romantically involved with Garrett, Petitioner failed the test.  *Id.*

Petitioner contends Owen later "coaxed" her into signing the plea agreement, which falsely characterized her as a participant in the conspiracy's profit scheme.  *Id.* at ¶ 16.  Petitioner maintains that other facts in the plea agreement are false as well, including that she was involved in the transportation of 1,000 kilograms or more of marijuana and derived the money recovered from her purse from criminal activity.  Owen purportedly told Petitioner she could not get a better deal if she told the truth.  According to Petitioner, she reluctantly signed the plea agreement, despite its factual inaccuracies.  Shortly thereafter, in January 2011, she terminated Owen and Long.

### c.      Jon Saia and Joseph Reed

Petitioner next hired Jon Saia and Joseph Reed.  She again disclosed to her attorneys that she only participated in the conspiracy under the threats and coercion of Garrett and Marco.  (Lee 06/14/12 Decl. Concerning Saia ¶ 2.)  Once again, her counsel advised her against bringing the allegations to light.  Saia allegedly described her prior counsel's theory as a "powerful angle," which would garner empathy from the Court.  *Id.* at ¶ 3.  He could see no good coming from putting forth her version of events.  Petitioner alleges that she disclosed to Saia and Reed that Owen had pressured her to sign the plea agreement, despite its factual inaccuracies.  *Id.* at ¶ 4.  She asked if

she could start over and renegotiate a plea agreement. Saia purportedly responded that it was "way too late" for that. *Id.*

In continuing the original defense theory, Saia purportedly arranged for a mental heath professional to examine Petitioner and offer an opinion as to why she would engage in such a serious criminal enterprise. Petitioner alleges that Saia "guided" her to "shape" her answers to corroborate the theory that she was an over-privileged girl acting out in a narcissistic manner against her successful and controlling father. *Id.* at ¶ 5. Saia also allegedly coached Petitioner to mislead the probation department during the pre-sentencing investigation in conformance with the theory, and to refrain from disclosing that she participated in the crimes under coercion and duress. (Pet. 17, ECF No. 222.) Saia continued this defense strategy through sentencing, indicating to the prosecutor and the Court that the facts contained in the plea agreement were accurate.

### 3. Petitioner's First Claim of Relief Lacks Merit

Even if the foregoing allegations are true, Petitioner cannot succeed on a claim of ineffective assistance of counsel for her attorneys' failure to raise a duress defense because she cannot establish that her attorney's conduct caused her prejudice.

### a. Objectively Unreasonable Performance

Based on the evidence she submits, Petitioner cannot demonstrate that her attorneys' failure to pursue a duress defense was objectively unreasonable. Her counsel's strategic choice to not pursue a specific theory is reasonable "so long as [their] 'reasonable professional judgment[] support[s] the limitations on investigation" and pursuance of other strategies. *Vinson v. McLemore*, 226 Fed. App'x 582, 585 (6th Cir. 2007) (quoting *Strickland*, 466 U.S. at 691); *see also Titlow v. Burt*, 680 F.3d 577, 587-88 (6th Cir. 2012) (quoting *Strickland*, 466 U.S. 690-91) ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

16

unchallengeable,' but 'strategic choice made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'"). Here, reasonable professional judgment supports each of Petitioner's six attorneys' decisions to forego a duress defense.

First, all the declarations Petitioner submitted in support of her motion demonstrate that her attorneys declined to pursue a duress defense based on their reasonable, professional judgment. According to Petitioner and her aunt Jin Lee, Meeks stated that based on his experience and expertise, he felt a duress defense would not serve her well. (Lee Decl. Concerning Meeks ¶12, Jin Lee Decl. ¶¶ 11, 12, ECF No. 247-2.) In addition to his professional experience, Meeks relied on his knowledge of and experience with the prosecutor in deciding which theory would best serve Petitioner's interests. *Id.* at ¶ 24. Likewise, Petitioner's declarations indicated that Owen and Long rejected the duress defense because "it's not something [they] can readily prove." (Lee Decl. Concerning Owen ¶ 4.) Owen allegedly counseled Petitioner that her version of events, even if proven, would not secure a better plea deal. *Id.* at ¶ 15. Similarly, Saia concluded that "no good" could come from advancing Petitioner's version of events in place of the "powerful angle" that had been presented up to that point. (Lee Decl. Concerning Saia ¶ 3). Simply put, none of Petitioner's attorneys dismissed her version of events out-of-hand or altogether ignored her story. Rather, each of her attorneys determined, based on his professional experience and judgment, that it was not in her best interest to pursue a duress defense. Having made that determination, the attorneys had no further obligation to investigate the allegations of threats and coercion. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*.") (emphasis added).

Indulging the strong presumption that counsel's performance was sufficient, as is required, *Strickland*, 466 U.S. at 689, the Undersigned concludes that Petitioner has failed to establish the first prong of the *Strickland* test with respect to her counsel's performance related to their strategic decision not to pursue a duress defense.

**b.    Prejudice**

Even assuming her counsel had performed deficiently, which they did not, Petitioner fails to demonstrate that she was prejudiced.  Again, when a defendant challenges her attorney's failure to pursue an affirmative defense, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59; *see also Hodges v. Colson*, 711 F.3d. 589, 610 (6th Cir. 2013) ("It is therefore clear that in determining whether a defendant has shown prejudice, a court must predict whether correction of the deficient performance might have enabled the defendant to succeed at trial.")  Here, an affirmative defense of coercion and duress had virtually no chance of success at trial.  Petitioner also argues that a duress defense would have entitled her to a plea agreement containing a downward departure, which would have resulted in a lighter sentence.  This argument also lacks merit.

To succeed on a coercion/duress affirmative defense at trial, a criminal defendant must prove the following five elements:

(1)    the defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

(2)    the defendant had not recklessly or negligently placed [herself] in a situation in which it was probable that [s]he would be forced to choose the criminal conduct;

(3)    the defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm;

(4)     a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm;

(5)     the defendant did not maintain the illegal conduct any longer than absolutely necessary.

*United States v. Singleton*, 902 F.2d 471, 472-73 (6th Cir. 1990). Petitioner would fail on at least three of these five elements.

*United States v. Stapleton*, 297 Fed. App'x 413 (6th Cir. 2008) is instructive. The defendant in *Stapleton*, a prison corrections officer, alleged that an inmate threatened and coerced her to smuggle drugs into the prison. *Id.* at 423. The inmate allegedly pulled the defendant into a room in the prison and threatened to kill her or members of her family if she refused to do it. *Id.* at 419. The inmate purportedly told the defendant personal things about herself and her family, and stated that he had contacts outside the prison walls. *Id.* The United States Court of Appeals for the Sixth Circuit affirmed the trial court's determination that the defendant failed to establish a *prima facia* defense of duress. *Id.* at 424. With respect to the first element of a duress defense, the court found that although the defendant may have faced impending danger when the inmate pulled her aside and threatened her, the "threat was no longer imminent or impending as soon as defendant was no longer in [the inmate's] presence." *Id.* The court also determined that the defendant had ample reasonable, legal alternatives to violating the law, such as enlisting the aid of law enforcement. *Id.* at 423-24. Finally, because it concluded that the defendant did not face an imminent threat when she engaged in the crime, the court found that she engaged in the criminal activity longer than absolutely necessary to avoid the threat. *Id.* at 424 n.1; *see also United States v.* Capozzi, 747 F. Supp. 2d 846, 852 (E.D. Ky. 2010) (holding that defendant, who alleged he escaped from a detention center due to duress, failed to make a *prima facia* showing of duress where he remained at large longer than necessary, specifically three days); *United States v. Sloan*, 401 Fed. App'x 66,

70 (6th Cir. 2010) (affirming district court's refusal to allow duress defense where the defendant "kept these firearms [unlawfully] for three weeks, and the defense of necessity or justification is generally applied in a situation that comes up quickly."); *see also United States v. Ibarra-Pino*, 657 F.3d 1000, 1007 (9th Cir. 2011) (holding that the defendant failed to establish a *prima facia* duress defense where he "did not proffer any evidence indicating that he could not escape the threatened harm either by contacting the authorities prior to the commission of the crime or cooperating with the authorities at the first opportunity. In addition, rather than attempting to escape the threatened harm by cooperating with the authorities at the first opportunity, [the defendant] attempted to mislead the [agents].").

Here, Petitioner would be unable to establish a duress defense for the same reasons the corrections officer failed to do so in *Stapleton*. First, although arguably Petitioner faced a threat during the in-person meeting with Garrett when he allegedly shouted and slammed his fists on the car, such threat "was no longer imminent or impending as soon as [Petitioner] was no longer in [Garrett's] presence." *Id.* at 424; *see also United States v. Gatti*, 434 Fed. App'x 364, 364-65 (5th Cir. 2011) (affirming denial of § 2255 motion claiming ineffective assistance of counsel for mishandling of duress defense where defendant could not have succeeded on duress defense because he did not face an imminent threat after he was no longer in the presence of the personal alleged to have threatened him). Nor was any alleged threat "imminent or impending" while Petitioner was arranging for the trips to haul marijuana, making the trips, or waiting in hotel rooms during the course of the trips. Even if Garrett's threats were somehow still looming, Petitioner had ample alternatives to making fourteen (or even eight or nine, as she now alleges) marijuana-hauling trips to Ohio. She could have contacted law enforcement at any point in the lengthy criminal endeavor. Indeed, Petitioner had more alternatives than most – she could have sought protection

not only from police, but, according to her declaration, also from her own personal bodyguards. Finally, even construing the facts she now sets forth as true, Petitioner engaged in the criminal enterprise far longer than necessary. Because Petitioner was not under an imminent threat when she committed the crimes, even the slightest period of involvement would have been longer than necessary. Some fourteen or so trips over the course of a ten-month period unquestionably constitutes longer involvement than absolutely necessary. *Cf. United States v. Davis*, 77 F.3d 483, 483 (6th Cir. 1996) (upholding trial court's refusal to permit a duress defense where the defendant engaged in the criminal activity for a year and a half); *Capozzi*, 747 F. Supp. 2d at 852; *Sloan*, 401 Fed. App'x at 70.

      Petitioner's arguments that she would have prevailed on a duress defense are untenable. She first asserts that a duress defense would have succeeded because it is the only rational explanation for her involvement in the conspiracy. According to Petitioner, nothing less than threats and coercion could motivate her, "a very successful and financially independent recording artist and model who also was born into a very wealthy family," to commit such a crime. (Pet. 19, ECF No. 222.) She continues that it is "inconceivable that an Asian heiress, with a history of being a prominent and respected socialite, would want to create an identity of a 'drug mule.'" (Am. Pet. 4, ECF No. 247.) Regardless of Petitioner's true motivation for engaging in the conspiracy, the fact remains that she has not and cannot establish the requisite elements of a duress defense. Without more, Petitioner's self-aggrandizing commentary regarding the purported unlikeliness that a privileged Asian heiress would commit such a serious crime falls woefully short of establishing a defense of coercion or duress.[5]

---

      [5]Petitioner also seemingly forgets that many individuals, including the prosecutor, at least one examining mental health professional, and the probation department, not to mention the Court, found it entirely conceivable that she committed this serious crime of her own free will, despite her privileged upbringing.

Completely unavailing to the point of absurdity is Petitioner's suggestion that her actions should be judged not by the objective standard of a reasonable person, but rather that of a reasonable Asian heiress. Petitioner argues that "there was no advocacy [at the trial court level] for her privileged and conservative Asian background, the cultural demands, [or] the inherent horror of failure and disgrace . . . ." (Reply 13-14.). She contends she is "an Asian heiress, cared for and sheltered her entire life by governesses, advisors, tutors, accountants, and bodyguards," and that she was "neither prepared, nor emotionally equipped, to deal with the Garretts and 'Marcos' of the world." (Pet. 9, ECF No. 222.) According to Petitioner, "to compare [her] with the average American is tantamount to ignorance, disparity and prejudice." (Reply 14, ECF No. 256.)

Petitioner has not advanced, and suffice to say the Court fails to find any support in the law for holding her to a "reasonable Asian heiress" standard in place of the well-established reasonable person standard. *Cf. United States v. Johnson*, 416 F.3d 464, 469 (6th Cir. 2005) (declining to deviate from the reasonable person standard, stating that the defendant's "'reasonable retarted person' standard is unknown to our criminal jurisprudence, state or federal, and cannot coexist with the well settled reasonable person standard").

Next, Petitioner maintains in various instances throughout her briefing that she was compelled to participate in the criminal activity to keep her family from discovering that she had an affair with Garrett and that this evidence would have established duress. *See* Pet. 9, ECF No. 222 ("[Petitioner was] adamant that her family not discover her brief relationship with Garrett, knowing [her] family would severely disapprove, particularly in light of [her] being engaged to . . . the family's chosen fiancé."); Reply 14 (stating that her "indiscretion with Garrett, particularly being who and what he was, was a disgraceful act of betrayal to her father personally"); Reply 6 (alleging that "any threat to disturb" her relationship with her fiancé, a man chosen by her father, "would

suffice to coerce [Petitioner] into submission"). Nevertheless, committing a crime to keep an affair hidden from one's family neither finds protection nor offers mitigation in our criminal justice system.

In her final attempt to demonstrate prejudice, Petitioner contends that she would have received a lighter sentence had her attorneys raised the defense of duress because she would have been eligible for a downward departure under the Sentencing Guidelines. (Pet. 17, ECF No. 222.) She also posits that such a defense would have avoided the upward departure for her status as an organizer or leader within the meaning of the Guidelines. *Id.* Even if Petitioner's predictions were correct, they are insufficient to establish prejudice with respect to her attorneys' performance during plea negotiations. *United States v. Garofolo*, 425 Fed. App'x 460, 461 (6th Cir. 2011) ("[The assertion that] a better plea negotiation would have allowed counsel to advocate for a lower sentence . . . does not establish prejudice, as it is relevant only to sentencing and not to whether [the defendant] would have pled guilty."); *see also Short v. United States*, 471 F.3d 686, 695 (6th Cir. 2006) ("[T]he petitioner's claim of prejudice rests upon an assertion that he wound up with a less favorable plea or sentence than he otherwise would have accepted with the advice of competent counsel. Such a claim is insufficient to establish prejudice."). Rather, in challenging counsel's effectiveness in advising her to enter into a plea agreement, Petitioner can only establish prejudice by demonstrating that, absent counsel's ineffectiveness, she would have insisted on going to trial. *Hill*, 474 U.S. at 59. She has made no such showing here.[6]

_____

[6]Indeed, it is entirely conceivable that raising the issue of duress would have garnered Petitioner a far stricter sentence. The Court imposed a lenient sentence in part because Petitioner accepted responsibility for her actions. During sentencing, the Court indicated approvingly that she understood and acknowledged the severity of her actions and had accepted responsibility. (Sent. Tr. 33:4-5, ECF No. 187.) The Court's seventy-two (72) month sentence was far below the Sentencing Guidelines range of one hundred thirty-five (135) to one hundred sixty-eight (168) months and the prosecutor's request for eighty (80) months.

Accordingly, the record conclusively establishes that Petitioner is not entitled to relief on her first claim of ineffective assistance of counsel. She cannot demonstrate that her counsel's rejection of a duress defense was objectively unreasonable or that it caused her prejudice. It is, therefore, **RECOMMENDED** that Petitioner's first claim of relief be **DENIED**.

**B.      Failure to Challenge Weight of Marijuana**

Petitioner next complains that she was denied effective assistance of counsel because none of her attorneys challenged the weight of the marijuana that officers seized the night of her arrest. Agents recovered approximately 506 pounds (approximately 229 kilograms) of marijuana from the suitcases Petitioner transported on the private jet on the day of her arrest. (06/15/10 Heufelder Aff. ¶ 3, ECF No. 1.) She complains that her attorneys should have argued to exclude packaging materials, stems and seeds from the overall weight, thereby reducing the weight to the actual amount of marijuana she was transporting. Instead of arguing to reduce the weight, Petitioner contends that her attorneys urged her to accept a plea agreement in which she admitted to transporting 1,000 to 3,000 kilograms of marijuana, "over four times the amount seized by the DEA." (Pet. 12, ECF No. 222.) Petitioner's claim for relief lacks merit.

The Court need not consider whether counsel's failure to challenge the weight of the marijuana was objectively unreasonable, because Petitioner cannot establish that her attorneys' conduct caused her prejudice. She has not alleged that she would have proceeded to trial and secured a more favorable outcome had her attorneys challenged the weight of the marijuana, which is required to establish prejudice. *Hill*, 474 U.S. at 59; *see also Hunter v. United States*, 160 F.3d 1109, 1115-16 (6th Cir. 1998) (noting that even if counsel acted unreasonably in advising defendant to plead guilty to possessing approximately 35 grams of cocaine base when he was caught with just 13.1 grams, "[the defendant] cannot satisfy the prejudice prong in the absence of any statement that

he is actually innocent, or would have gone to trial if his attorney's performance had been different.").[7]  Thus, the record conclusively establishes that Petitioner is not entitled to relief on her second claim of ineffective assistance of counsel.  It is, therefore, **RECOMMENDED** that Petitioner's second claim of relief be **DENIED**.

## C.      Failure to Move to Suppress Evidence

Next, Petitioner contends that she was denied effective assistance of counsel because her attorneys failed to pursue a motion to suppress evidence.  Petitioner's first set of counsel did not file a motion to suppress the evidence seized from the traffic stop or the statements she made during her initial interview with DEA agents.  Petitioner's second set of attorneys, Owen and Long, filed a motion to suppress the evidence seized from the stop.  In the motion to suppress, Owen and Long argued that officers lacked reasonable suspicion to initiate the traffic stop as well as probable cause to search Petitioner's vehicle and luggage.  (Mot. to Supp., ECF No. 73.)  Owen and Long later withdrew the motion, a decision which Petitioner now contends constitutes ineffective assistance of counsel.  She also claims ineffective assistance in her counsel's failure to move to suppress her pre-arrest statements.

---

[7]The Court notes, however, that Petitioner now mischaracterizes the offense with which she was convicted.  She did not plead guilty to possessing the 500+ pounds of marijuana discovered after she departed her private jet.  She was convicted of conspiracy to possess with the intent to distribute 1,000 kilograms of marijuana.  The conspiracy charge makes her culpable for all of the illegal narcotics distributed during the course of the criminal enterprise.  According to the record, Petitioner admitted to arranging fourteen marijuana-transporting trips.  Government officials "conservatively" estimated that the organization distributed 7,000 pounds (approximately 3,175 kilograms) of marijuana.  Even if her attorneys had successfully argued that she was caught with just shy of five hundred pounds, as she now contends they should have, the overall amount transported during the conspiracy would still exceed 3,000 kilograms.  That she now alleges she arranged merely "eight or nine" trips does nothing to alter the analysis.  Eight trips hauling nearly 500 pounds of marijuana totals over 1,800 kilograms of marijuana, which is well within the 1,000 to 3,000 kilogram range contained in her plea agreement.  Simply put, even if counsel had challenged the weight of the marijuana seized the night of Petitioner's arrest, the terms of the plea agreement would not have been any different.

### 1.     Evidence Seized from the Stop

To prevail on her first suppression-related claim, Petitioner would first have to establish that her counsel's decision to forego the suppression motion was not a product of calculated strategy. *See Benge v. Johnson*, 312 F. Supp. 2d 978, 1025 (S.D. Ohio 2004) ("[C]ounsel's failure to file a motion to suppress . . . was the result of a calculated strategy, not oversight or neglect[, and is thus] entitled to a great deal of deference."); *see also Rodriguez v. Warden, S. Oh. Corr. Facility*, No. 3:11-cv-282, 2013 WL 170113, *5 (S.D. Ohio 2013) (finding that counsel reasonably decided against filing a motion to suppress under the circumstances, "i.e., if a motion to suppress were filed, the state's plea offer would no longer be available and Petitioner would face a mandatory ten-year sentence if the motion to suppress were denied.")  (report and recommendation adopted).

The parties have not provided sufficient materials for the Court to resolve Petitioner's claim. Although it appears from Petitioner's briefing that Owen and Long may have withdrawn their suppression motion pursuant to a calculated strategy, *see* Am.  Pet. Ex. C, ECF No. 247-1 (Long explaining in an e-mail correspondence that the motion would fail and that a better course would be to accept the prosecution's plea deal); Am. Pet. 17, ECF No. 247 (Petitioner acknowledging that Owen and Long withdrew the motion because the prosecutor indicated that he would withdraw any favorable sentencing recommendation if they did not), the parties have not provided sufficient and proper, non-hearsay evidence on the issue.  Accordingly, the parties are **DIRECTED** to expand the record on the narrow question of whether Own and Long withdrew their motion to suppress pursuant to a calculated strategy.  Specifically, the parties are **DIRECTED** to submit affidavits of those individuals having personal knowledge of this issue.  The affidavits must be properly authenticated.

Petitioner would also have to overcome the second *Strickland*-hurdle to succeed on this claim, which requires her to establish that her attorney's failure to pursue the motion to suppress caused her prejudice. To establish prejudice in this regard, Petitioner must "'prove that [her] Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.'" *Tankesly v. Mills*, 491 Fed. App'x 649, 655 (6th Cir. 2012) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). The Supreme Court has indicated that "[a]lthough a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim . . ., a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief." *Kimmelman*, 477 U.S. at 382. To prevail on her motion, Petitioner would have had to establish that agents lacked reasonable suspicion to initiate the traffic stop or that they lacked probable cause to search her luggage. Reasonable suspicion is "a 'reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011) (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)). Probable cause is a "'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994).

Again, the parties have not submitted sufficient materials for the Court to resolve the prejudice-prong of Petitioner's claim. The parties are **DIRECTED** to expand the record on the narrow question of whether Petitioner's motion to suppress the evidence seized from the traffic stop

was meritorious. Specifically, the parties are **DIRECTED** to submit affidavits of those individuals having personal knowledge of this issue. The affidavits must be properly authenticated. After the Court considers the expanded record, it will determine whether an evidentiary hearing is necessary to make a final ruling on Petitioner's third claim of relief.

### D. Improper Advice to Plead Guilty

Petitioner next asserts that she was denied effective assistance of counsel because her attorneys improperly advised her to plead guilty to the terms contained in the plea agreement. To overcome the two-prong *Strickland* test in challenging advice to plead guilty, a defendant must first demonstrate that counsel's ineffectiveness prevented her from entering a knowing and voluntary guilty plea. *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). The Supreme Court has recognized that "[w]here a defendant enters a plea of guilty upon counsel's advice, the voluntariness of the plea depends on whether the advice was within the range of competence demanded of attorneys in criminal cases." *Hill*, 474 U.S. at 58. Second, to demonstrate prejudice a defendant must establish that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Petitioner has failed to establish either deficient performance on the part of her attorneys or prejudice here.

Petitioner first asserts that her counsel was deficient in failing to secure more favorable plea terms. (Pet. 17, ECF No. 222.) She faults counsel for advising her to agree to the quantity of marijuana set forth in the plea agreement; advising her to agree that she was an organizer or leader in the conspiracy; and failing to disclose to the prosecutor and Court that she purportedly participated in the crime under coercion and duress. *Id.* at 16-17. Petitioner has failed, however, to demonstrate that counsel's advice rendered her plea involuntary or that it was otherwise outside the normal range of competence demanded of attorneys in criminal cases. In fact, the transcript of the

plea proceedings establishes that Petitioner knowingly and voluntarily pled guilty. (Plea Tr., ECF

No. 132.) During the plea proceedings, Petitioner engaged in the following exchange with the

Court:

> THE COURT: Have you discussed with your counsel any possible defenses to the charges in the indictment that you might have?
>
> THE DEFENDANT: Yes.
>
> . . . .
>
> THE COURT: Do you believe that Mr. Saia is fully informed about the facts and circumstances giving rise to this case?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Has your lawyer fully advised you on the nature and meaning of the charge and any defenses to the charge that you might have?
>
> THE DEFENDANT: He has.
>
> THE COURT: Are you satisfied with your lawyer's advice and representation?
>
> THE DEFENDANT: Yes.
>
> . . . .
>
> THE COURT: Ms. Lee, please be advised that under the Constitution and laws of the United States, you have the right to plead and indeed to persist in a plea of not guilty. You have the right to be tried by a jury and, at a speedy and public trial, you have the right to confront the witnesses against you, you have the right to counsel, and you have the right to refuse to testify yourself unless you voluntarily choose to do so in your own defense. At such trial, Ms. Lee, you will be presumed innocent until such time, if ever, the government establishes your guilt by competent evidence beyond a reasonable doubt. At such trial, you will be entitled to the issuance of subpoenas to compel the attendance of witnesses on your behalf. Do you understand that by pleading guilty, you give up the rights that I've just mentioned?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that by pleading guilty you also give up or

waive your right to a trial since there will not be a further trial of any kind in your case?

THE DEFENDANT:    Yes.

THE COURT:    Further, do you understand that by pleading guilty, you will also have to waive or give up your privilege against self-incrimination since I will have to ask you questions about what you did in order to satisfy myself that you are, in fact, guilty as charged, and you will have to acknowledge your guilt?

THE DEFENDANT:    Yes.

THE COURT:    Are you willing to waive your right to a trial and all of the other rights that I've just discussed?

THE DEFENDANT:    Yes.

. . . .

THE COURT:    Is it your decision to plead guilty your own free and voluntary act?

THE DEFENDANT:    It is.

THE COURT:    Have you ben subjected to threats of force of any kind which caused you to plead guilty?

THE DEFENDANT:    No.

. . . .

THE COURT:    The Court has observed the appearance and responsiveness of Ms. Lee in giving her answers to the questions asked. In light of the Court's observation and in light of the answers given, the Court is satisfied that Ms. Lee is in full possession of her faculties. She is not suffering from any apparent physical or mental illness. She is not under the influence of narcotics or alcohol. She understands the proceedings in which she is engaged. She understands the nature and meaning of the charge and the consequences of her plea of guilty. She is aware of all plea negotiations taken on her behalf. I find that the Defendant is fully competent and capable of entering an informed plea, that her plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. Her plea is therefore accepted and she

is now adjudged guilty of the offense.

*Id.* at 3, 6-8, 9-12, 14-15.

Accordingly, not only has Petitioner failed to allege that her counsel's advice to plead to the terms of the hearing agreement rendered her plea involuntary, but her exchange with the Court during the plea undermines any argument that it did.

Nor can Petitioner establish that her counsel's advice to plead guilty caused her prejudice. Nowhere in her four briefs submitted in support of her Motion does Petitioner allege that she would have gone to trial absent her counsel's purported ineffectiveness. Rather, Petitioner alleges prejudice from her attorney's alleged failure to "advocate for a better plea bargain." (Pet. 17, ECF No. 222.) Petitioner's speculation that she may have been able to obtain a better plea deal does not establish prejudice. *See Short v. United States*, 471 F.3d 686, 697 (6th Cir. 2006) ("Under the *Hill* standard, ineffective assistance claims do not turn on [] speculative considerations."); *United States v. Garofolo*, 425 Fed. App'x 460, 461 (6th Cir. 2011) (rejecting the notion that prejudice is established by showing "that a better plea negotiation would have allowed counsel to advocate for a lower sentence," as it is "relevant only to sentencing and not whether [the defendant] would have pled guilty'").[8]

---

[8]Petitioner relies on *Missouri v. Frye*, 132 S. Ct. 1399 (2012) to argue incorrectly that she can demonstrate  prejudice by showing that "counsel's deficient performance led [her] to plead guilty to less favorable terms tha[n] would have been available absent the ineffective assistance . . .."; and that "the prejudice inquiry is not limited to asking whether the defendant would have proceeded to trial, but rather, whether the defendant would have accepted the offer to plead pursuant to the more favorable terms." (Pet. 17, ECF No. 222.) Petitioner misunderstands *Missouri v. Frye*.

In *Frye*, the Supreme Court addressed the question of "whether defense counsel has the duty to communicate the terms of a formal offer to accept a plea on terms and conditions that may result in a lesser sentence, a conviction on lesser charges, or both." *Frye*, 132 S. Ct. at 1408.  The Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* The Court's holding, however, is limited to instances in which the prosecution makes a formal plea offer. *Id.*  Indeed, the Supreme Court explicitly stated that "[t]his application of *Strickland*

Petitioner's remaining arguments are likewise unavailing. Petitioner asserts that her plea was involuntary because counsel informed her that if she pled guilty she would only serve two years in prison. (Am. Pet. 19, ECF No. 247.) Her counsel's prediction notwithstanding, the Court fully advised Petitioner of the potential sentence related to her guilty plea. (Plea Tr. 8, 9-10, 14, ECF No. 132.) Moreover, Petitioner indicated that she understood the potential consequences of her guilty plea:

> THE COURT: Do you understand that the mandatory minimum penalty is ten years, and that the maximum possible penalty is life imprisonment, a $4 million fine, five years supervised release, and a one hundred dollar special assessment? Do you understand that's the maximum possible penalty?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that if I accept your plea of guilty, I can impose this maximum penalty?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you understand that if I accept your plea of guilty, I can impose the same penalty as though you pleaded not guilty, stood trial, and were convicted by a jury?
>
> THE DEFENDANT: Yes.
>
> . . . .
>
> THE COURT: Ms. Lee, has anyone made any other or different assurances of any kind which induced you to plead guilty?

---

to instances of an uncommunicated, lapsed plea does nothing to alter the standard laid out in *Hill*." *Id.* at 1409. Rather, "[i]n cases where a defendant complains that ineffective assistance of counsel led [her] to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, [she] would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Hill*, 474 U.S. at 59).

Here, Petitioner does not allege that her counsel failed to communicate a formal offer from the prosecution to accept a plea on more favorable terms. She alleges that her counsel was ineffective for advising her to accept the plea offer that she did. Thus, *Hill* controls here; not *Frye*.

THE DEFENDANT: No Your Honor.

THE COURT: . . . Ms. Lee, aside from the plea agreement we just discussed, has any person, including an agent or officer of the government or any of the attorneys in this case, promised or suggested that you will receive a lesser sentence or some other form of leniency in exchange for your plea of guilty.

THE DEFENDANT: No.

*Id.* at 8, 9, 14.

Thus, the Court provided Petitioner with correct information as to the potential sentence that it could impose, which vitiates her claim that her plea was involuntary. *See Boyd v. Yukins*, 99 Fed. App'x 699, 703 (6th Cir. 2004) (where petitioner claimed that her plea was not knowing or voluntary because counsel allegedly gave her misinformation on the sentence, the Court of Appeals determined that the trial court had remedied any misconception by informing the petitioner of the potential maximum and minimum sentences); *see also United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993) (finding that defendant was not entitled to withdrawal of guilty plea where his attorney erroneously predicted he would be sentenced to probation since the sentencing judge provided him with correct sentencing information). Moreover, "[u]nfulfilled subjective expectations of counsel and a defendant regarding the possible length of sentence do not render an otherwise valid plea involuntary." *United States v. Ford*, 15 Fed. App'x 303, 308 (6th Cir. 2001)*; see also Irvin v. Parke*, 786 F.2d 1165, 1165 (6th Cir. 1986) (citing *Stout v. United States*, 508 F.2d 951 (6th Cir. 1975)) ("A subjective belief that a lenient sentence will be imposed, on a guilty plea, even if that belief is based on an erroneous estimation by counsel does not invalidate a guilty plea."). Finally, Petitioner has not alleged, nor does the record suggest, that she would have insisted on going to trial had her attorney predicted she would receive a six year sentence. Petitioner cannot, therefore, establish that her counsel's alleged ineffectiveness caused her

prejudice. *Hill*, 474 U.S. at 59. It is, therefore, **RECOMMENDED** that Petitioner's fourth claim of relief be **DENIED**.

**E.      Ineffective Assistance of Counsel at Sentencing**

Petitioner next contends that she was denied effective assistance of counsel at the sentencing phase of her prosecution. Again, however, Petitioner challenges aspects of her counsel's defense strategy. She complains that her attorney counseled her against disclosing during the pre-sentence interview that she allegedly participated in the criminal enterprise due to duress and coercion. (Pet. 17, ECF No. 222.) She further complains that counsel failed to object to the Court's erroneous findings of fact at the sentencing hearing, and failed to raise the disparity in her sentence compared with those of her coconspirators. *Id.* Relatedly, Petitioner suggests her counsel's insistence that she withhold the alleged coercion and duress from the pre-sentence interview and conform her answers to fit counsel's strategy caused the pre-sentencing report to contain factual inaccuracies. (Pet. 19, ECF No. 222.) She contends she was harmed because the Court relied on those factual inaccuracies in imposing its sentence. *Id.*

Petitioner's fifth claim of relief lacks merit. First, any factual findings the Court made during sentencing were based on the terms of the plea agreement, and accompanying statement of facts, into which Plaintiff knowingly and voluntarily entered, or the facts contained in the pre-sentencing investigation report, to which Petitioner also admitted. During sentencing, the Court asked Defendant if she received a copy of the pre-sentencing investigation report. (Sent. Tr. 3, ECF No. 187.) Petitioner responded, "I did, Your Honor." *Id.* The Court asked her if she had read and discussed those documents with her attorneys. *Id.* Petitioner responded that she had. *Id.* The Court asked defense counsel, "[a]re any of the factual statements contained in the [presentence investigation report] disputed by defense?" *Id.* Petitioner's counsel responded that none were

disputed.  *Id.*

Moreover, Petitioner knowingly and voluntarily admitted to the factual assertions Agent Heufelder made during the plea proceedings.  (Plea Tr. 15-17, ECF No. 132.)  She admitted to transporting fourteen separate shipments of marijuana.  *Id.* at 15, 17.  She admitted to "participat[ing] in all facets of the transportation of the marijuana loads from Los Angeles, California, to Ohio, as well as the transport of drug proceeds back to Los Angeles."  *Id.* at 16, 17. She admitted receiving "approximately $60,000 per trip."  *Id.*  Given Petitioner's knowing and voluntary decision to admit to these facts while under oath during the plea proceedings, counsel did not act unreasonably in failing to object to the factual findings during sentencing.  Petitioner cannot establish the first prong of the *Strickland* test.  Nor has she alleged that she would have insisted on going to trial had her counsel acted differently.  Thus, the record conclusively establishes that Petitioner is not entitled to relief on her fifth claim of ineffective assistance of counsel. Accordingly, it is **RECOMMENDED** that Petitioner's fifth claim of relief be **DENIED**.

## F.     Miscellaneous Issues Related to Petitioner's Arrest and Plea

Petitioner raises various additional issues in her briefing that similarly lack a basis for relief. Petitioner contends she was denied effective assistance of counsel because her attorneys failed to secure her pre-trial release in a detention hearing.  (Am. Pet. 7, 16, ECF No. 247.)  She also complains that Thomas was ineffective for advising her to sign an initial forfeiture document.  *Id.* at 7.  In addition, Petitioner suggests that she was denied effective assistance of counsel because Owen granted interviews with the media concerning her case.[9]  *Id.* at 16.  None of these actions by

---

[9]Petitioner also suggests she was denied effective assistance of counsel because her attorneys failed to file a motion for severance.  *Id.* at 12.  A motion for severance pertains specifically to a trial.  Fed. R. Crim. P. 14; *see also, e.g., United States v. James*, 496 Fed. App'x 541, 546 (6th Cir. 2012) ("Under Federal Rule of Criminal Procedure 14(a), a district court may order separate trials for a defendant facing a multi-count indictment if the 'joinder of offenses . . . appears to prejudice a defendant . . . .'").  Because Petitioner waived her right to trial, there

counsel undermines reliance in the outcome of the proceedings. *Strickland*, 466 U.S. at 691-92

("[T]he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the

assistance necessary to justify reliance on the outcome of the proceeding."). The record thus

conclusively establishes that Petitioner is not entitled to relief on these miscellaneous issues. It is,

therefore, **RECOMMENDED** that Petitioner's sixth claim of relief be **DENIED**.

## G.    Failure to Advise of Right to Appeal

Finally, Petitioner asserts that she was denied effective assistance of counsel because her

attorney failed to inform her of her ability to appeal the Court's denial of her motion for discovery,

and failed to inform her of her right to appeal her sentence.

A variation on the two-prong *Strickland* test extends to counsel's failure to consult with the

defendant regarding an appeal. *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). In such a situation, the

Court first asks whether counsel disregarded specific instructions from the defendant concerning

the filing of an appeal. *Id.* at 477. If so, counsel's actions are objectively unreasonable and the

Court moves on to the prejudice inquiry. If not, the Court must next determine whether counsel

consulted with the defendant about an appeal. *Id.* at 478. The term consult, in this regard, means

"advising the defendant about the advantages of taking appeal, and making a reasonable effort to

discover the defendant's wishes." *Id.* If counsel has not consulted with the defendant, "the court

must in turn ask a second, subsidiary question: whether counsel's failure to consult with the

defendant itself constitutes deficient performance." *Id.* If so, then the first prong of the *Strickland*

test is satisfied.

In determining whether a failure to consult with the defendant constitutes deficient

performance, the Supreme Court has held that counsel has a "constitutionally imposed duty to

---

would be no reason for her counsel to file a motion for severance. As such, their failure to do so
was not objectively unreasonable.

consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are non-frivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. The Supreme Court further elaborated as follows:

> In making this determination, courts must take into account all the information counsel knew or should have known. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id.* Next, a Court must consider whether counsel's deficient performance caused the defendant prejudice. *Id.* at 481. "[T]o show prejudice under these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him [or her] about an appeal, he [or she] would have timely appealed." *Id.* at 484. "[E]vidence that . . . the defendant in question promptly expressed a desire to appeal will often be highly relevant in making this determination." *Id.* at 485. Although evidence that the defendant "sufficiently demonstrated to counsel his [or her] interest in an appeal" will satisfy the first prong of the *Strickland* test, the deficiency prong, "such evidence alone is insufficient to establish that, had the defendant received reasonable advice from counsel about the appeal, he [or she] would have instructed counsel to file an appeal." *Id.* at 486. Also, "a defendant's inability to specify the points he would raise were his right to appeal reinstated will not foreclose the possibility that he can satisfy the prejudice requirement where there are other substantial reasons to believe that he would have appealed." *Id.* (quotation marks and internal citation omitted). Rather, "the defendant [must[]

demonstrate that, but for counsel's deficient conduct, he would have appealed." *Id.*

Here, Petitioner alleges that her counsel failed to consult with her regarding an appeal with respect to both her motion for discovery and her sentence.

## A.      Denial of Motion for Discovery

Petitioner contends that she was denied effective assistance of counsel because her attorney failed to consult with her about appealing the Court's denial of her motion for discovery. During the pre-trial process, Petitioner filed a motion for discovery in which she sought the identity of the confidential informant who alerted agents to Petitioner's criminal activity. (Pet. 21, ECF No. 222.) Petitioner contends that with the informant's identity she could have attacked the reliability of the informant's tip. Had she successfully attacked the reliability of the tip, Petitioner speculates that she could have prevailed on her motion to suppress the evidence seized during the traffic stop. She never got that chance, however, because the Court denied her motion for discovery. Petitioner complains that her counsel should have consulted with her about appealing the denial of her discovery motion. *Id.* at 22.

Petitioner's claim that she was denied effective assistance of counsel with respect to her motion to discovery lacks merit. Petitioner cannot establish prejudice because the Court's denial of her discovery motion could not have been appealed until after her sentence was imposed. 28 U.S.C. § 1291 (recognizing that the court of appeals has jurisdiction to hear appeals "from all final decisions" of the district court); *United States v. Jolivette*, 257 F.3d 581, 583 (6th Cir. 2001) ("Final judgment in a criminal case . . . means sentence.").[10] Indeed, Petitioner's failure to enter into a

---

[10]Although in some cases an order may be appealed prior to entry of final judgment in a criminal case, none of those exceptions applies here. *See United States v. Goff*, 187 Fed. App'x 486, 493-94 (6th Cir. 2006) (setting forth the collateral order doctrine, which "excepts a narrow range of interlocutory decisions from the general rule," none of which applies here).

conditional guilty plea in which she specifically reserved the right to appeal pre-trial motions foreclosed her ability to appeal the Court's denial of her discovery motion in any event. *United States v. Alexander*, 540 F.3d 494, 504 (6th Cir. 2008); *see also United States v. Bell*, 350 F.3d 534, 536 (6th Cir. 2003) (quoting *United States v. Bahhur*, 200 F.3d 917, 923 (6th Cir. 2000) ("'[A] defendant forecloses all subsequent non-jurisdictional appeals to his conviction by pleading guilty or nolo contendere'; thus, 'by failing to enter into a conditional plea under Rule 11(a)(2), defendant waived his right to appeal the district court's denial of his pre-trial motion to dismiss.'"). Accordingly, the record conclusively establishes that this portion of Petitioner's claim of relief fails. It is, therefore, **RECOMMENDED** that Petitioner's claim relating to her attorney's failure to consult regarding an appeal of her motion for discovery be **DENIED**.

**B.     Sentence**

Petitioner next challenges her counsel's failure to consult with her about appealing her sentence. With respect to the first *Flores-Ortega* inquiry, the record provides no indication that Petitioner gave counsel express instruction regarding an appeal. Petitioner alleges, and Respondent appears to concede, that Saia, Petitioner's attorney at sentencing, did not consult with her about appealing her sentence. Thus, this Court must determine whether counsel's failure to consult with Petitioner about an appeal was constitutionally deficient.

Petitioner complains that her sentencing counsel's alleged failure to consult with her on her right to appeal her sentence was objectively unreasonable. Petitioner alleges in her first amended motion that she expressed interest to Attorney Saia in appealing her sentence. (Am. Pet. 25, ECF No. 247.) Specifically, she alleges that she turned to Saia after the Court imposed its sentence and asked, "[i]s there anything else we can do?" *Id.* According to Petitioner, Saia responded, "no." *Id.* Moreover, in a Declaration attached to her Reply, Petitioner avers that after the imposing its

sentence, the Court asked her if she would like to appeal. (Petitioner Declaration 20, ECF No. 247-2.) Petitioner contends that she responded in the negative, only after Saia whispered in her ear, "say no." *Id.* Petitioner complains that Saia's failure to consult with her regarding an appeal under these circumstances was constitutionally deficient.

Respondent denies that counsel's failure to consult with Petitioner regarding an appeal was constitutionally deficient, although it fails to address Petitioner's allegation that she expressed an interest in appealing. Respondent asserts that Petitioner "admits that she showed no interest to her attorney in appealing [the] sentence . . . ." (Op. 29, ECF No. 254.) This assertion is not supported by a citation to the record, and, in any event, conflicts with the allegations contained in the amended petition. (Am. Pet. 25, ECF No. 247.) Having taken the position that Petitioner expressed no interest in appealing, Respondent posits that Saia had no duty to consult about an appeal. Respondent emphasizes that Petitioner pled guilty to the offense and declined to exercise her right to appeal when asked by the Court, both of which factors indicate that a rational defendant in her position would not want to appeal. (Op. 29, ECF No. 254.)

With respect to the final inquiry under *Flores-Ortega*, neither party squarely addresses whether Petitioner suffered prejudice from Saia's failure to consult regarding an appeal. As discussed earlier, a defendant suffers prejudice in this respect if there exists a "reasonable probability" that she would have appealed had counsel consulted with her. *Flores-Ortega*, 528 U.S. at 486. Again, Petitioner contends that she expressed a desire to appeal. Though not dispositive, the Supreme Court has recognized that an expression of a desire to appeal constitutes some evidence that the defendant would have appealed had her attorney consulted with her. *Id.* at 485. The Court concludes that, at this juncture, the parties have not provided sufficient materials for the Court to resolve Petitioner's claim related to an appeal of her sentence. The parties are

**DIRECTED** to expand the record on the narrow issues of (1) whether non-frivolous grounds exist for Petitioner to appeal her sentence; (2) whether Petitioner expressed an interest in appealing; and (3) whether there exists a reasonable probability that Petitioner would have appealed her sentence had counsel consulted with her.  Specifically, the parties are **DIRECTED** to submit affidavits of those individuals having personal knowledge of these issues.  The affidavits must be properly authenticated.  Upon review of the expanded record, the Court will determine whether an evidentiary hearing is necessary to resolve Petitioner's claims.

## V.

Finally, Petitioner attempts to "waive" her right to physically appear before the Court for an evidentiary hearing.  She indicates that "[a] personal appearance would require being transported, cuffed and shackled, by the US Marshals, to Ohio, with interim housing at maximum security detention and transfer facility."  (Pet. (Notice to the Court) 40, ECF No. 222.)  The Court emphasizes, in no uncertain terms, that, if an evidentiary is necessary in this case, Petitioner will not be permitted to appear by telephone.  Besides being wholly unworkable for conducting an evidentiary hearing, Respondent has the right to cross-examine Petitioner, personally, under oath.  Moreover, Petitioner could not call or examine witnesses for herself remotely.  If she intends to prosecute this § 2255 Motion, Petitioner will have to conform to the applicable rules and procedures of this Court, just as any other applicant who seeks to vacate his or her sentence.  Despite being "a very successful and financially independent recording artist and model who also was born into a very wealthy family" (Pet. 19, ECF No. 222) and her "history of being a prominent and respected socialite," (Am. Pet. 4, ECF No. 247), this Court will not afford Petitioner any special privileges to which she seems to have become accustomed.

## VI.

Accordingly, Petitioner's Motion to Transfer to Presiding Judge is **DENIED AS MOOT**. (ECF No. 261.)  It is **RECOMMENDED** that Petitioner's first, second, and fourth through sixth claims of relief be **DENIED**.  (ECF No. 222.)  It is further **RECOMMENDED** that Petitioner's third claim of relief as it relates to her counsel's failure to seek suppression of her pre-arrest statements be **DENIED**.  With respect to the remaining portion of Petitioner's third claim of relief, pursuant to Rule 7 of the Rules Governing Section 2255 Cases, the parties are **DIRECTED** to expand the record on the narrow issues of (1) whether Owen and Long withdrew their motion to suppress pursuant to a calculated strategy; and (2) whether Petitioner's motion to suppress the evidence seized from the traffic stop was meritorious.  Specifically, the parties are **DIRECTED** to submit affidavits from those individuals having personal knowledge of these issues.  The affidavits must be properly authenticated.  It is further **RECOMMENDED** that Petitioner's seventh claim of relief as it relates to her counsel's failure to consult about appealing the denial of her discovery motion be **DENIED**.  With respect to the remaining portion of Petitioner's seventh claim of relief, the parties are **DIRECTED** to expand the record on the narrow issues of (1) whether there existed non-frivolous grounds for an appeal of her sentence; (2) whether Petitioner expressed an interest in appealing; and (3) whether there exists a reasonable probability that Petitioner would have appealed her sentence had counsel consulted with her.  Again, the parties are **DIRECTED** to submit properly-authenticated affidavits from those individuals having personal knowledge of these issues. The parties are further **DIRECTED** to authenticate any materials provided to expand the record with respect to Petitioner's third and seventh claims of relief, including affidavits of those individuals with personal knowledge of the pertinent issues.

The Court imposes the following briefing schedule with respect to the requirement that the parties submit supplemental briefing: the parties are **DIRECTED** to expand the record by

42

providing the materials as set forth herein **WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER**.  The parties are further **DIRECTED** to admit or deny the correctness of the opposing party's materials **WITHIN FORTY-FIVE (45) DAYS OF THE DATE OF THIS ORDER**.

## VII.

Although generally any party who seeks review of a Report and Recommendation of a Magistrate Judge may file objections to the Report and Recommendation within fourteen (14) days, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), the parties are **DIRECTED** to **HOLD IN ABEYANCE** any objections to this Report and Recommendation.  Upon review of the evidence the parties present in accordance with the Court's Order directing them to expand the record, the United States Magistrate Judge will issue a supplemental Report and Recommendation addressing Petitioner's ineffective-assistance-of-counsel claim as it relates to her motion to suppress evidence and her counsel's alleged failure to advise her of her right to appeal her sentence.  At that time, the parties will be given the opportunity to object to the instant Report and Recommendation, as well as the supplemental Report and Recommendation.

**IT IS SO ORDERED**.

DATE: July 15, 2013                                      */s/  Elizabeth A. Preston Deavers*
                                                        **ELIZABETH A. PRESTON DEAVERS**
                                                        **UNITED STATES MAGISTRATE JUDGE**